## DETERMINED IN THE

# Supreme Court of Judicature,

### OF THE

# STATE OF NEW JERSEY,

### FEBRUARY TERM, 1829.

---

### DEN ex dem. ZOPHAR HETFIELD against MOSES JAQUES.

Where lands descended, are *bona fide* aliened by the heir before suit brought, they cannot be taken in execution on a judgment against the heir for a debt of his ancestor.

And a mortgage, by the heir of the lands descended, before suit brought, is considered as an alienation, within the meaning of the statute.

The fact that the mortgagee, knew at the time when he took the mortgage, that the land had belonged to the decedent, and that the decedent left debts unpaid, would not, of themselves, be evidence of bad faith in the mortgagee.

---

This was an ejectment tried before his Honor the *Chief Justice* at the Middlesex Circuit in December, 1826, and came before this court upon a case stated, by his Honor the *Chief Justice,* and agreed to by the counsel of the parties, in the following words, *viz :* " Middlesex Circuit, December, 1826."

*Scudder* read the transcript and opened the case on the part of the plaintiffs, the declaration is of November term, 1826, for 100 acres, &c., in the township of Woodbridge, on

the demise of Zophar Hetfield, made on the 1st June, 1826, to hold from that day, &c., and ouster on the 2d June, 1826.

The premises in question are, a tract of about 80 acres of land situate in the township of Woodbridge.

Admitted that John O. Jaques died, seized of the premises in question in the year 1816 ; that he left the following children and heirs at law, *viz :* Thomas F. R. Jaques, Samuel Jaques, Annabella, wife of Jonathan B. Marsh, John D. Jaques, Eliza, wife of Lewis Roberts, Margaret, wife of Jacob Oliver, Mary Jaques, Charlotte Jaques, James Jaques, George Jaques and Martha Jaques.

The plaintiff's counsel then read in evidence, a deed dated 17th November, 1824, from Charles Carson, Esq., sheriff of the county of Middlesex, to Zophar Hetfield, the lessor of the plaintiff, for a tract of 80 acres, more or less, situated in the township of Woodbridge, being the premises in question. This deed recites a sale made at public vendue on the 8th November, 1824, by virtue of executions issued on three judgments in the Supreme Court, against Samuel Jaques, Jonathan B. Marsh, and Annabella, his wife, John D. Jaques, Lewis Roberts, and Eliza, his wife, Jacob Oliver, and Margaret, his wife, Mary Jaques, Charlotte Jaques, James Jaques, George Jaques, and Martha Jaques, heirs at law of John D. Jaques, dec'd. One of said judgments was of November term, 1823, at the suit of the executors of Joseph Shotwell, for $1,815.19, the penalty of a bond. The 2d thereof was of May term, 1824, at the suit of Uzal O. Marsh, for $440.79. And the 3d thereof of May term, 1824, at the suit of Zophar Hetfield, for $1,400.79.

Agreed by the counsel that these judgments and executions be considered as read in evidence, and that if this cause should go to the bar of the Supreme Court, all objections to discrepancies between the judgments and executions recited, and those to be there produced, shall be open to the parties respectively, and such objections to have the same effect as if now made.

Admitted that the defendant is in possession of the premises in question, and was so at the commencement of this suit.    Lease, entry and ouster, confessed.

Plaintiff rested.

Mr. *Frelinghuysen* opened for defendant.

The defendant's counsel then read in evidence :

1. A deed dated 8th September, 1818, recorded 14th June, 1820, from Thomas F. R. Jaques to John D. Jaques, in consideration of $825, for all his estate, right and interest, &c., in the premises in question, and other lands.

2. A deed dated 8th May, 1820, and recorded 14th of June, 1820, from Samuel Jaques and Ann his wife, to John D. Jaques, in consideration of $600, for all his estate, right, and interest, &c., in the premises in question, and other lands.

3. A bond, the execution of which was admitted, dated 9th July, 1821, from John D. Jaques to Moses and D. R. Jaques, conditioned for the payment of $1000.

4. A mortgage from the same to the same, and of the same date, and containing the same premises as are contained in the two deeds last above mentioned, to secure the payment of the aforesaid bond.

5. A deed dated 27th July, 1824, from Charles Carson, Esq., sheriff of the county of Middlesex, to Moses Jaques, for the premises in question, among other lands : this deed recites a sale made 9th June, 1823, on an execution issued on a judgment in the Supreme Court of the 12th November, 1822, in favor of the executions of Joseph Shotwell against John D. Jaques.

Agreed by the parties, that this judgment and execution be considered as read in evidence, and if this cause should go to the bar of the Supreme Court, all objections to discrepancies between the judgment and execution recited, and those to be then produced, shall be open to the parties respectively, and such objections to have the same effect as if now made.

Defendant rested.

Admitted, at the request of the plaintiff's counsel, that the aforesaid John D. Jaques and the defendant, are distantly related by blood, and that he married a niece of defendant.

Admitted, that pending an action of the executors of Joseph Shotwell, against the administrators of the aforesaid John O. Jaques, and before the commencement of the suit by the said executors against the heirs of the said John O. Jaques, in which the aforementioned judgment was obtained, Moses Jaques, the present defendant, paid to the said executors the amount of their claim against the administrators, and thereby became equitably entitled to the benefit of the said claim, and that at the time of the sale made by the sheriff, under the execution above mentioned, against the said heirs, the money to be raised by the said execution was equitably due and payable, and was afterwards paid to the said Moses Jaques, the defendant.

A verdict was taken for the plaintiff by consent of the parties, subject to the opinion of the Supreme Court, upon the foregoing case : If the plaintiff is entitled to recover, judgment to be entered for him with costs, and the verdict and judgment to be modified as to quantity or proportion, if any, to be recovered according to the opinion of the said court.

If the plaintiff is not entitled to recover, the verdict to be set aside, and judgment, as in case of non-suit, with costs, to be entered.

Either party to be at liberty to turn this case into a special verdict, for the purpose of a writ of error.

*Scudder* and *Chetwood*, for the plaintiff.

*Hornblower* and *Frelinghuysen*, for the defendant.

EWING, C. J.   The premises which the plaintiff seeks to recover in this cause, are three undivided ninth parts of a farm of about eighty acres of land, in the county of Middlesex, of which John O. Jaques was seized and possessed at the time of his decease intestate in the year 1816.

John O. Jaques, at his death, was indebted upon a bond to Joseph Shotwell. Judgment was obtained in an action on this bond, in February term, 1821, by the executors of Joseph Shotwell, against John D. Jaques and Randolph Jaques, administrators of John O. Jaques. On this judgment an execution was issued, and return was made to the term of May, 1821, that the administrators had no goods and chattels of the deceased in their hands, to be administered. An action was afterwards commenced in this court, by the executors of Joseph Shotwell, against John D. Jaques, Samuel Jaques, and others, heirs at law of John O. Jaques, by process of summons returned to May term, 1823, and judgment was obtained in November term following, for the debt and costs " to be levied of the lands and tenements, which were of the said John O. Jaques, deceased, in fee simple at the time of his death, which came to, and now is in the hands of the defendants by hereditary descent from the said John O. Jaques, deceased." An execution was issued, commanding the sheriff to make the debt and costs of the lands and tenements whereof the said John O. Jaques died seized in fee simple in the hands of " the defendants, or in the hands of any or either of them." This execution was returned to February term, 1824, " levied on all the lands and tenements whereof John O. Jaques died seized, to wit, a farm situate, &c., containing eighty acres more or less," &c., which is the farm already mentioned, and of which the premises in question are part. In May term, 1824, two other judgments were obtained against the heirs, one at the suit of Uzal O. Marsh, and the other in favor of the lessor of the plaintiff in this cause. Under these three executions, the farm was sold on the 8th of November, 1824, and a deed of conveyance was made on the 17th of the same month, to the lessor of the plaintiff.

By virtue of this deed he seeks to recover, the three-ninth parts of the farm, the premises in controversy.

The evidence exhibited on the part of the plaintiff shews, *prima facie* a title to the premises, and right to recover in this action. Thus far indeed no difficulty or dispute exists. The questions raised in the cause, and argued by the counsel grow out of the matters relied on in defence; which we are therefore now to proceed to examine.

The defendant alleges that the plaintiff ought not to recover, because at the time of the sale by the sheriff, and of the judgments which are supposed to have authorized it, the title to the three undivided parts was incontrovertibly vested in him; and in the following manner: On the 8th of September, 1818, after by the decease of John O. Jaques, intestate, the inheritance descended to his heirs at law, one of them Thomas F. R. Jaques, in consideration of $825, conveyed one-ninth part, being his share to John D. Jaques. On the 8th of May, 1820, Samuel Jaques, another of the heirs, in consideration of $600 conveyed another ninth part to the said John D. Jaques. On the 9th of July, 1821, the said John D. Jaques mortgaged, the ninth part which came to him by descent, and the two ninth parts which he held by purchase to the defendant to secure the payment of a bond for $1000. In November term, 1822, judgment in this court was obtained by the executors of Joseph Shotwell against the said John D. Jaques, surviving administrator of John O. Jaques, on a *devastavit*, founded on the above mentioned judgment of February term, 1821. Execution of *fieri facias de bonis et terris* was issued, was levied on three undivided ninth parts of the above mentioned farm described as "late the property of John O. Jaques, deceased," and was returned to February term, 1823. On the 9th of June, 1823, a sale was made, and on the 27th of July, 1824, a deed was executed by the sheriff to the defendant for the three ninth parts among other lands.

And thus, as the defendant insists, a title is shewn in him, paramount to the title of the plaintiff.

The first question which presents itself is, were the premises in controversy liable to the judgments and executions against the heirs under which the sale was made or either of them.

According to the common law, if lands descended to an heir, were *bona fide* aliened by him before the commencement of an action against him for a debt of his ancestor, the lands were not liable to be taken in execution. Nor was the debt then recoverable at law against the heir himself· By such alienation both the heir and the lands were placed at law out of the reach of the creditor. If however the alienation was not *bona fide*, or was made after the commencement of the suit, or after the original purchased, as the older books express it, the lands were chargeable and might be taken in execution under the judgment against the heir. *Co. Lit.* 102, *a*; 3 *Bac. Abr. tit.*; *Heir and Ancestor* 26. This hardship on the creditor of the ancestor was remedied in England by the statute of 3d and 4th *Wm. and Mary, C.* 14. The heir was made liable, to the value of the lands descended, if he aliened them, even in good faith, before the commencement of the suit. The lands, as before, remained liable if aliened *mala fide* or after the writ was sued out against the heir. In the revision of our laws, by *Judge Patterson*, this statute of *Wm. and Mary* was adopted in very nearly the words of the original. The second *section, Patt.* 243, *Rev. Laws* 291, directs that "execution shall be taken out upon any judgment so obtained against such heir or heirs to the value of the said lands, tenements or hereditaments as if the same were his, her or their own proper debt; but the lands, tenements and hereditaments which were *bona fide* aliened, before the action brought, shall not be liable to such execution."

From a view of this statute it is seen, then, that the question proposed will depend on the solution of another. Were the premises in question *bona fide* aliened by the heirs to whom they descended, before the action by the executors of Shotwell was brought against them?

And here the topics of inquiry being now distinctly disclosed, it is proper to remark that the point decided by *Chancellor Williamson*, in the case of *Parret* v. *Van Winkle*, which was read on the argument by the defendant's counsel, is different from the matter in question before us. There the strife was between a mortgage by the heir, and a sale by the administrator, under an order of the Orphans' Court subsequently obtained; and the Chancellor decided that a purchaser at such a sale could not wrest the land from the holder of a *bona fide* mortgage made prior to the order. In the present case the preference is to be settled between a mortgage by the heir and a judgment and execution against him in his individual character on the one hand, and an action, judgment, and execution against him as heir on the other.

From the view of the facts which I have presented, it will be noticed that at the commencement of the suit against John D. Jaques and others, as heirs, he held the three shares now in question, subject to the mortgage he had made to the defendant, one by descent from his father, the others by purchase from his co-heirs. For the sake of clearness and order, it will be proper to keep distinct the shares he held by purchase from that he took by descent.

And first, of the two shares he purchased from his brothers: It has been shewn that lands aliened *bona fide*, prior to the commencement of a suit, are not liable to the execution which may be obtained in such suit against the heirs. Now it is a point of no difference to whom the alienation, if *bona fide*, is made, whether to a stranger or to one of the heirs. The pivot is alienation in good faith. These two shares, subject to the mortgage made to the defendant were, at the commencement of the suit, held by John D. Jaques, not by descent or as heir of his father, but as alienee of his co-heirs. Was the alienation to him in good faith? I find, in the state of the case, no evidence to the contrary. The facts relied on are, that the property

had belonged to the deceased, and that the alienee was one of the administrators. These facts are, however, equivocal. Both are consistent, and may well stand with fairness and integrity in the alienation. The alienation of these two shares was made before the commencement of the action against the administrators. The personal estate was the primary fund for the payment of debts. It may have been in the present case apparently sufficient to discharge them. Subsequent to the alienation, by unforeseen losses or other adventitious circumstances, the face of things may have greatly changed. I speak of these as matters which may have existed, without saying that they did exist; for the party whose interest it was to furnish evidence of bad faith, if it existed, which we are not allowed to presume, but the contrary, has given us no light on these topics. And if John D. Jaques paid upwards of $1500 to his brothers for these shares, as the deeds avow, and which has not by proof been gainsaid, then a somewhat strong inference seems fairly to result, that he did not anticipate any jeopardy to these shares from the debts of the decedent. It is to be farther remarked, that as the matter appears on the documents before us, the alienation was not in satisfaction of an antecedent debt due from the alienor to the alienee, but an actual sale for a consideration in money paid. In *Parret* v. *Van Winkle, Chancellor Williamson* did not consider the fact that the land had belonged to the decedent as in itself evidence of bad faith in the mortgage. In *Mead* v. *Orrery*, 3 *Atk.* 235, and in *Nugent* v. *Gifford*, 1 *Atk.* 463, knowledge that the property assigned was assets, and the purchaser's knowledge of debts in general, were not of themselves, in the opinion of *Chancellor Hardwicke*, sufficient to affect the validity of assignments made for a valuable consideration, and when no collusion existed. Without going beyond the matters presented by the state of the case, I do not find in the alienations by Thomas and Samuel Jaques, badges of fraud or any facts on which a charge of bad faith can be

sustained. It follows then, that these two shares or ninths of the premises in question, were *bona fide* aliened by the heirs to whom they descended before the action by the executors of Shotwell, was brought against them; and, consequently, they were beyond the reach of the execution issued on the judgment in that action.

On the 9th day of July, 1821, John D. Jaques, as is set forth in the state of the case, mortgaged to the defendant Moses Jaques, to secure the payment of a bond of $1000 from the former to the latter, all his interest in the farm, being the two-ninths he held by purchase already considered, and the one-ninth he held by descent. The latter remains to be examined.

In the term of November, 1822, judgment was obtained in this court by the executors of Shotwell against John D. Jaques. On the 9th of June, 1823, a sale was made by the sheriff under an execution issued on that judgment; and on the 27th July, 1824, a deed was executed by the sheriff to the present defendant. By this sale and conveyance, the equity of redemption of John D. Jaques, in the three-ninth parts, became vested in the defendant, subject, however, to such right, if any, as the commencement previous to the sale of the action against the heirs, might have created in the one-ninth part which John D. Jaques then held by descent; for in the language of *Chancellor Williamson*, the lien of the creditors attached upon the lands descended by the institution of the action against the heirs.

But as the mortgage from John D. Jaques to the defendant, was made long prior to the commencement of the action against the heirs, if that was an alienation in good faith, within the meaning of the act of the legislature heretofore mentioned, it will afford a legal protection to the defendant, from any recovery in the present action. First, then, to examine the question of good faith. The bond from John D. Jaques to the defendant, exhibiting a debt due from the former to the latter, is a part of the state of the case, and

the existence and fairness of the debt have not been in any wise impeached. It may well be supposed that the defendant knew when he took the mortgage that the land had belonged to John O. Jaques, deceased, and the manner by which it came to John D. Jaques. But these matters have been shewn already to be insufficient to give the taint of bad faith to the transaction. And there is nothing in the case from which an inference can be drawn, that the defendant when he received the mortgage, knew there was any debt of John O. Jaques outstanding and unpaid ; especially as the date at which the defendant became equitably entitled to the benefit of the claim of the executors of Shotwell against the administrators of Jaques, which in the state of the case, as originally prepared, was left somewhat vague and indefinite, has been since fixed by documents furnished to the court by the attorneys of the parties, and now to be taken as a part of the state of the case, to have been the 9th of June, 1823, a day long subsequent to the date of the mortgage. It was, however, insisted by the plaintiff's counsel, that a mortgage is not an alienation within the meaning of the legislature. For this doctrine I can find no support. A mortgagee is everywhere recognized as a purchaser *pro tanto. Cowp.* 278. 6 *John. Ch. Rep.* 433.

By means of the sheriff's deed, so far forth as it may extend, and by means of the mortgage, the defendant has shewn a valid, legal, and effectual defence against the present action.

But it is farther insisted, that as the defendant in June, 1823, pending the action against the heirs became by purchase the real owner of the demand against them, and afterwards judgment being obtained, caused, for his benefit, the sale to be made, under which the lessor of the plaintiff claims, he cannot be permitted to say that by the sale no title was obtained to the three-ninth parts which are in controversy. It is not, however, proved, nor even alleged, that the defendant used any fraudulent suppression or conceal-

ment, or made any false suggestions. The levy and sale were made and conducted in the ordinary manner, and of consequence, subject to the mortgage, if the mortgage was, as 1 have sought to shew, a subsisting *bona fide* alienation. If a creditor having two claims, one secured by mortgage, should under a judgment on the other, sell the mortgaged premises, it would be in vain to say he had thereby defeated his mortgage. Moreover, in the present case, six-ninth parts of the farm of the deceased John O. Jaques, did, as no one in this cause has disputed, pass to the lessor of the plaintiff by the sheriff's sale and conveyance.

DRAKE, J. The history of the claim of Moses Jaques, the defendant, is briefly this, that in 1820, about four years after the death of John O. Jaques, from whom the premises in question descended, John D. Jaques, one of the heirs at law, and then owner of three shares of these premises, executed to the said Moses Jaques a mortgage thereon, to secure the payment of one thousand dollars. After which, finding the executors of Shotwell prosecuting for a debt due to them by the deceased, he purchased that debt and pursued the legal remedies for the recovery of it; first stripping John D. Jaques of all his remaining interest in the said lands, and then pursuing the residue of the estate in the hands of the heirs at law, until finally, at the sheriff's sale when the lessor of the plaintiff became the purchaser, he obtained his money.

There is no pretence that the mortgage was not for a full consideration, or that the claim of the executors of Shotwell was not just. And if they were not objectionable, I cannot discover any fraud in the conduct of Moses Jaques, or that he was so circumstanced as to be prevented from pursuing the legal remedies for the recovery of his claims. The mortgage and the judgment against John D. Jaques, and sale of his interest, were matters of public record. Zophar Hetfield purchased with full knowledge of all the

circumstances, and when he bid, could not have calculated that he was obtaining any interest in the mortgaged premises; unless upon the ground, now urged by his counsel, that the debts of the ancestor, John O. Jaques, remained a lien upon his lands, and that they could not be aliened by his heirs free from the incumbrance of those debts until they should be paid.

Upon this question there has been much doubt, and it is singular that it has not before this been presented for the determination of this court, in as much as it is liable to arise upon almost every death of a person seized of real estate.

By the common law, if the heir aliened before action brought, the creditor had no remedy. This, however, was corrected by the statute 3d and 4th *William* and *Mary, Ch.* 14. In New Jersey, says *Chief Justice Kinsey, Coxe's reports* 133, "it has long been settled that lands are assets, in the hands of an executor or administrator for the payment of debts, and that upon an action brought against either, the real estates of the testator or intestate are chattels, may be taken in execution, and sold for the payment of debts, and this without making the heir a party to the suit." But although this may have been the law in 1792, the legislature thought proper to alter it in 1797, and by the act, *Rev. Laws, p.* 291, authorized an action to be commenced against the heirs, or against the heirs and devisees where there was a will; and providing that if they had aliened or made over the lands descended, or devised, before action brought, such heir or devisee should be liable to the value of the lands; and that execution should go against such heir or devisee accordingly. "But the lands, tenements and hereditaments which were *bona fide* aliened before the action brought, shall not be liable to such execution." And if not liable to such execution, in what manner should they be made liable? It is under such execution that the plaintiff in this case claims; and the statute

expressly says, that if the lands were *bona fide* aliened before suit brought, they shall not be liable to it. The only question then is, were they *bona fide* aliened? As I have said before, no fraud appears, and it is not to be presumed.

The plaintiff in this case can derive no benefit from the act of 1799, making lands liable to be sold for the payment of debts; *Rev. Laws, p.* 430. He does not claim the benefit of any proceeding by the executor or administrator to sell the lands to pay debts after the personal assets proved deficient. There has been no application to the Orphans' Court, or order for sale. And if there had been, it has been decided by the chancellor in the case of *Parret* v. *Van Winkle* and *Van Riper*, that under that statute the lands are bound only from the time of obtaining the order for sale.

The legislature of New Jersey have lately passed a law upon this subject. By the act of December 12th, 1825, they have not merely limited the continuance of the lien upon lands for the debts of the ancestor, but they have expressly created that lien for the term of one year; thus giving a legislative exposition of the previous statutes. Upon the whole, I am of opinion that the plaintiffs should not recover the mortgaged premises.

Let there be judgment for the defendant.